## Bradbury v. Kingston Coal Co., Appellant.

[Marked to be reported.]

*Negligence—Mines—Fellow servants.*

An engineer employed to run an engine at a colliery is a fellow servant of the miners whom the engineer raises and lowers in the shaft of the mine.

An engineer in charge of a colliery engine attempted to stop the engine by pulling his reverse lever. He pulled it a little too far, not intending to do so, and thereby caused the cage in the shaft to shoot upward rapidly. Plaintiff's decedent, who was on the cage, attempted to jump off on the upper platform, but missed his footing and fell down the shaft and was killed. The cage stopped almost at the instant he jumped off, and those who remained on it were unharmed. *Held* that there could be no recovery against the colliery company.

*Master and servant—Machinery—Risk of employment.*

Where an accident results from an unforeseen cause not discoverable in advance of its occurrence, with no visible defect in any part of the machinery, and no knowledge of any defect on the part of the men who were constantly using the machinery, or of the employer, the accident is one of the ordinary risks of the employment which the servant takes upon himself.

The breaking of a wire pin caused an engineer to lose control of the throttle of his engine, resulting indirectly in an injury to a miner descending the shaft of the mine. The wire pin was conclusively shown to have been amply sufficient for its purpose, and free from original defect, by the fact that for seven years it continuously and successfully served its use without any change, repair, substitution or visible defect. It gave no external indication of defect up to the time of the accident, and there was no testimony that it had diminished in size, or changed in appearance or in substance; no crack or flaw was discovered, and on the actual testimony in the cause no defect was visible or known to the engineer, the mine inspector, or the employer. *Held* that the breaking of the pin was one of the ordinary risks of employment assumed by the workman.

Argued April 13, 1893.   Appeal, No. 193, Jan. T., 1893, by defendant, from judgment of C. P. Luzerne Co., Jan. T., 1889, No. 36, on verdict for plaintiff, Rowena Bradbury. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and THOMPSON, JJ.

Trespass for death of plaintiff's husband.   Before RICE, P. J. The facts appear by the opinion of the Supreme Court.

The court charged in part as follows:

" The employer is bound to furnish machinery and appliances that are of ordinary character and reasonable safety, and the former is the conclusive test of the latter; whatever is, according to the general use, the ordinary course adopted by those in the same business is reasonably safe within the meaning of the law. So that if it depended simply upon the question whether the use of the spring cotter in place of a burr and a spring cotter at the time this engine was put in was negligence, we should say to you that it was not, because, according to the testimony of witnesses here, about which there can hardly be any room for doubt, this was one method at least which was in very common use. But it is argued that even if this was so, yet the device used by the defendant company differed from the spring cotter in ordinary use. The points of difference to which your attention has been directed are, that in the spring cotter which is usually furnished by manufacturers of these engines the inner side of the wire is flattened, while in this case the wire was left in its original round state. I have carefully examined the testimony, and while it does appear that there is that difference, yet I do not recollect any witness who testified that the use of a wire of proper material, even though it were round and were put in in the same way that this was, would not be as safe as the use of the spring cotter which is manufactured and furnished by the wholesale. If it was as safe as that which is ordinarily furnished with such engines as the contrivance for the purpose of holding the bolt, we do not think that the defendant company ought to be held guilty of negligence, because they did not use the precise form of cotter which is usually furnished.

" But there remains the other question, and this is a question of fact to be determined by the jury. It appears from the testimony that this engine was put in place in 1881. The accident occurred in October, 1888. According to the testimony of the engineer this cotter had to be taken out about four times a year and put back again, and he has described to you the method in which it was taken out and the method in which it was put back, and in view of this testimony we submit to you this question: Had the key or cotter become so weakened by use that it was no longer safe, and did the defendant know or ought the defendant to have known that fact by the exercise

of ordinary care and diligence? You are not to determine this question by looking backward to see what actually did take place. If a man could see ahead as well as he can see backwards he would make very few mistakes, so that you are not to judge of this question by what has transpired, but what, in the exercise of ordinary care and diligence, the defendant knew or ought to have known at the time the accident took place. [If the fact that the use of such a contrivance for that period of time in the way that it was used would have the effect of rendering it weak and unsafe, and such as a man of ordinary care and prudence ought to have known, then knowledge was brought home to the defendant company. But if it was a fact which would not have been known in the exercise of ordinary care and prudence, but was a fact which, while proved, would only have been known by the exercise of extraordinary knowledge, skill and care, then the defendant company would not be affected with notice because they did not know it. In considering this question you are to take into consideration the length of time it had been in use, the manner of its use, the nature of the material, and the examination and inspections that have been made. We may say to you that if you find it had been carefully and frequently examined, and upon such examination no defect appeared in it, then the defendant company would not be guilty of negligence in continuing its use. But if you find, however, from all the circumstances in the case to which we have called your attention, that ᵗ ·was defective, that it had become defective by reason of use, ᵤ ·ᵈ that this was a fact which the defendant company knew or ought to have known in the exercise of ordinary care and prudence, then it was their duty to replace it, and they would be guilty of negligence in not so doing.] [1]

" So much for the allegation of negligence upon the part of the defendant company. [Was the deceased guilty of contributory negligence?⁵ Has it turned out that it was not necessary for him to have jumped from the carriage? If he had remained upon the carriage he would have escaped without injury, as did the others; but that fact is not conclusive by any means upon the question of his negligence. That is to be determined by a consideration of the danger which he appeared to be in ; and if a man of ordinary care and prudence would, in view of

the danger that appeared, have pursued the course that he did, he could not be guilty of negligence, even though it turned out that it was a mistaken course."] [2]

Defendant's points were among others as follows :

" 7. The plaintiff having proved that the breaking of the spring cotter was probably due to bending and hammering by the engineer, and that the accident was caused by its breaking, the plaintiff cannot recover, for the reason that the negligence, if any, was that of a fellow servant. *Answer :* We decline to charge as requested in that point. We say to you, however, if the accident was occasioned by the negligence of the engineer, either in that particular or in any other particular, then the plaintiff could not recover, because it would be the negligence of a fellow servant." [3]

" 9. That under all the evidence, the verdict of the jury must be for the defendants. *Answer :* We decline to charge as requested in that point, because it would have the effect of withdrawing from your consideration the question of fact, which we think it is your province to decide." [4]

Verdict and judgment for plaintiff for $4,500. Defendant appealed.

*Errors assigned* were (1–4) instructions, quoting them.

*H. W. Palmer*, for appellant.—In an action by an employee against his employer, in the absence of definite proof of some negligence which directly or naturally results in injury to the employee, the accident is regarded as one of the hazards of the employment of which the servant takes the risk, and for which there can be no recovery : Mensch v. P. R. R., 150 Pa. 598.

A mine owner should be allowed to rely on the judgment of the man whom the law compels him to employ for the purpose of judging machinery. The law will not hold him guilty for not knowing more than his inspector.

It was the duty of defendants to furnish those in their employ with ordinary machinery, such as, with reasonable care, may be used with safety. This was the precise measure of their duty, nothing more, nothing less : Shaffer v. Haish, 110 Pa. 575 ; Augerstein v. Jones, 139 Pa. 189. The breaking of the pin, which immediately prior to the accident showed no defect or

weakness, was no evidence of negligence : Baker v. R. R., 95 Pa. 211.

The danger was one of the risks of employment: R. R. v. Bresmer, 97 Pa. 103 ; P. & C. R. R. v. Sentmeyer, 92 Pa. 276 ; Sykes v. Packer, 99 Pa. 465; North Cent. R. R. v. Husson, 101 Pa. 7; Allison Mfg. Co. v. McCormick, 118 Pa. 519 ; P. & R. R. R. v. Hughes, 119 Pa. 301.

Deceased contributed by his own reckless conduct to cause the accident and injury complained of.

The accident was due to the negligence of a fellow servant.

*William H. Hines, Edward A. Lynch* with him, for appellee. —Defendant neglected the duty of proper inspection: R. R. v. Huber, 128 Pa. 63 ; Mensch v. R. R., 150 Pa. 598.

If an opportunity to discover the defect was shown to have existed, and attempt to repair was made, then a condition of liability would arise, in which the absence of exculpatory proof would justify an inference of culpable negligence : R. R. v. Huber, 128 Pa. 63 ; Baker v. Allegheny V. R. R., 95 Pa. 211.

It is the duty of employers to renew instruments of this character at proper intervals. The expense would certainly not be great, and a due regard for the lives of their servants imperatively demands it : Whart. Neg. § 210 ; Schall v. Cole, 107 Pa. 1 ; Ford v. R. R., 110 Mass. 241; Phila. R. R. v. Keenan, 103 Pa. 124.

It is the master's duty to be careful that his servant is not induced to work under the notion that tackle or machinery is staunch and secure, when in fact the master knows or ought to know that it is not so : Beach, Neg. § 136 ; Frazier v. Pa. R. R., 38 Pa. 104.

It is the master's duty to keep himself informed of the condition of his machinery, and notice of a defect will be presumed after the lapse of a sufficient time : Kibele v. Phila., 105 Pa. 41 ; Reese v. Payne, 100 Pa. 301 ; Mullan v. Steamship Co., 78 Pa. 25 ; Wood's M. & S. § 366 ; Railroad v. Lempe, 11 A. & E. R. R. Cas. 201 ; Patterson v. R. R., 76 Pa. 389 ; Shaffer v. Haish, 110 Pa. 577 ; Augerstein v. Jones, 139 Pa. 189 ; Pittsburgh R. R. v. Sentmeyer, 92 Pa. 280 ; McKee v. Bidwell, 74 Pa. 218.

If a man of ordinary care and prudence would, in view of the

danger that appeared, have pursued the course he did, he could not be guilty of negligence even though it turned out that it was a mistaken course: Schall v. Cole, 107 Pa. 1: Penna. R. R. v. Warner, 89 Pa. 59.

The engineer was not a fellow servant: Mullan v. Steamship Co., 78 Pa. 32 ; P. & R. R. v. Hughes, 119 Pa. 315 ; Baker v. Allegheny V. R. R., 95 Pa. 211 ; Lewis v. Seifert, 116 Pa. 647 ; Rummell v. Dilworth, 111 Pa. 351.

The case was properly left to the jury : Kehler v. Schwenk, 151 Pa. 517.

OPINION BY MR. JUSTICE GREEN, October 2, 1893:

The plaintiff's husband lost his life by falling down the vertical shaft of a coal mine operated by the defendant. The manner and occasion of his fall were thus : He and two others, all of them workmen in the employ of the defendant, stepped upon the cage used for the purpose of lowering the men to the mine. When they had descended a few feet, the engineer at the mouth of the shaft, discovering that he had lost control of the throttle valve, undertook to stop, and did stop, the further descent of the cage. In order to do this he pulled the reverse lever for the purpose of shutting off the steam, so that the large drum which held the descending rope attached to the cage would stop. To do this successfully he should only have pulled the reversing lever to the centre notch in the ratchet, and at that point the steam would have been shut off which caused the drum to revolve, and thereupon it would stop running. But, unfortunately, he pulled the lever, without intending to do so, a little past the centre notch, and this opened the way for the steam to enter the opposite end of the steam chest, and the effect of that was to produce a reverse motion of the drum which started the cage upwards. The engineer who was examined for the plaintiff thus describes the occurrence : " Q. What did you notice after you lowered them five or ten feet? A. I noticed I had no control of the throttle valve. Q. Felt it getting loose and that you had no control of it ? A. No control of it. Q. What did the engine do—was there a reversal or not ? A. I used my reverse lever in place of the throttle valve ; I could shut the steam off with the reverse lever, and that would stop the steam from going on to the piston. . . . Q. You got hold

of the reverse lever did you?   A. I had hold of the reverse lever at the same time.   Q. At the same time that you noticed something wrong with the throttle valve?   A. Yes, sir.   Q. Did you reverse the lever?   A. I pulled the reverse lever back to the centre notch.   Q. What effect did that have on the action of the machinery and car?   A. Providing I could have put it—   Q. What was done there?   A. By pulling the lever to the centre I pulled it over the centre and gave it the other way, and that projected the cage upwards.   Q. In reversing the engine, turning that reverse lever over, if you had got it in the notch the carriage would not have started up at all?   A. No, sir.   Q. But because you pulled it by the notch that sent it up?   A. Yes, sir.   Q. That was accidental?   A. Yes, sir, accidental; my intention was to get it into the notch for to shut the steam off the engine.   Q. And pulling it by the centre, so it let the steam in the other end, was accidental?   A. Yes, sir. Q. You didn't mean to do that?   A. No, sir. . . .   Q. You shoved the reversing lever a little past the centre?   A. I pulled it over the centre, and that caused the upward tendency. Q. And that had the effect of sending the carriage up?   A. Yes, sir.   Q. Of letting the steam on the other end?   A. Yes sir, the other side of the cylinder. . . .   Q. How far up did the cage run?   A. Why the cage run from where it started about forty-five feet. . . .   Q. After you got the cage stopped, you say you got the cage stopped by this action with your reverse lever?   A. Yes, sir.   Q. And you got it up then about forty odd feet?   A. Forty-five feet. . . .   Q. What did you do then—did you lower it down?   A. I put the brake on and considered a little bit, and I slackened my brake and let the carriage down by the brake where it stood. . . .   Q. And you put your brake on and stopped that car?   A. I put my brake on when I had the reverse lever right in the notch, and the engine stopped."

It is thus seen that the upward motion of the cage was the result of an accidental mistake of the engineer, in pulling his reverse lever a little too far over—just past the centre notch. Had he stopped pulling where he intended to stop, at the centre notch, the engine would have stopped, just as it did when he let the cage down, and the accident would not have happened. It must be observed further that the accident did not happen as

the result of any defect in the machinery, nor merely as the result of the upward motion of the cage.   When the cage reached the upper landing, the deceased, for some reason which he did not explain, but which might fairly be attributed to apprehension of danger, jumped from the car and that was the last that was seen of him till his dead body was found at the bottom of the shaft.   He evidently tried, notwithstanding the rapid upward movement of the cage, to jump off on the upper platform, and in doing so fell into the shaft.   The other two men who were with him on the cage remained there, and were not hurt. Had he remained there he would not have been hurt.

Now this is the whole story of the accident.   The engineer attempted to stop the engine by pulling his reverse lever.   He pulled it a little too far, not intending to do so, and he thereby caused the cage to shoot upward rapidly.   The deceased attempted to jump off on the upper platform, but missed his footing and fell down the shaft and was killed.   The cage stopped almost at the instant he jumped off and those who remained on it were unharmed.   The upward motion of the cage was caused by the unintentional mistake of the engineer, and it was the rapid upward motion of the cage alone, and exclusively, that caused apprehension in the mind of the deceased, and, it may be conceded, that it was that apprehension which induced him to take the terrible risk he did in leaping from the cage.

Now the engineer was a fellow servant of the deceased and for his mistake, whether negligent or otherwise, the defendant company is certainly not liable.   We cannot see that it is of any consequence what his reason was for attempting to stop the engine.   It was not his desire, or his attempt, to stop the engine, no matter from what cause, that, of itself alone, caused the accident, but the manner of stopping it.   Stopping the engine would have prevented the accident, and this is what the engineer attempted.   There was no defect in the machinery that prevented him from stopping it just where he wanted to stop it.   But he pulled the reverse lever a little too far, and that, and that alone, let on the steam and caused the upward motion.   The upward motion caused the apprehension of the deceased, and that apprehension caused him to do the very rash act of jumping from the cage when it was in rapid motion, and thereby losing his life.   Had the engineer pulled his lever more

carefully and stopped it where he intended to, in the centre notch of the ratchet, the upward motion of the cage would not have taken place, and the accident would not have occurred. How then is the defendant to be held responsible, unless it is legally responsible for the fault, or the mistake or negligence of the engineer, who was the fellow servant of the deceased? We cannot see, and therefore are of opinion that the judgment should be reversed for that reason.

The case was tried, almost entirely, upon the theory that a cotter pin, or a substitute for it made of wire, had broken and fallen out from its position through the end of the fulcrum pin or bolt, of the throttle lever, and that the fulcrum bolt then worked out of its place, and thus the engineer lost the control of the throttle valve. It is contended for the plaintiff that the wire cotter pin was defective from long use, and that the defendant ought to have known of the defect and corrected it before the accident, and because that was not done the defendant was liable for the death of the plaintiff's husband.

It was also claimed for the plaintiff that this kind of a cotter pin was not in common use and was insufficient for its service, and therefore its use by the defendant was negligence. In reference to these last contentions we agree with the learned court below in holding that wire cotter pins such as this were in common use, and the employment of it was not negligence. The very great preponderance of the testimony was to this effect, and also to the effect that they were quite as safe as the spring cotter, split at the end, or as a fulcrum bolt with a nut or a burr on the end secured by a spring cotter. The plaintiff's own witness, Miles, the engineer, was asked: " Q. Was that the usual and ordinary contrivance to be used in a place like that? A. Yes, sir, that is what I have always seen used in all the places I have been to." Only two witnesses for the plaintiff, one an engineer and the other a machinist, testified that it was not in common use, and in their opinion was not safe; but against this was the testimony of the engineer, who was also a witness for the plaintiff, and, in addition to that, the testimony of Edward H. Jones, who was the general manager of the Vulcan Iron Works, where great numbers of engines with this same kind of a cotter were made; of Charles Graham, who was the master mechanic of the Bloomsburg division of the Dela-

ware, Lackawanna & Western R. R. Co.; of G. M. Williams, who was the mine inspector for that district; of James Pollock, who was mechanical engineer for the Lehigh & Wilkes-Barre Coal Co.; of Forbes Vannan, master mechanic of the Montour Iron and Steel Company's works, and who built this very engine; of J. H. Bowden, chief engineer of the Pennsylvania Railroad Coal Car Co.; and of William Jones, machinist, working for the Kingston Coal Company, all of whom concurred that the cotter appliance on the fulcrum bolt was in common use in all that region, and that in their opinion it was a perfectly safe appliance, and that whether it was made of bent wire entirely round, or of wire split at the end and flattened on one side, it was equally safe. The testimony on this subject is so voluminous, and so emphatic and precise in its character, and so very greatly preponderating over that of the plaintiff, not only in numbers, but in weight and character, that we will not undertake to repeat it here. It was so impressive in its character that the learned judge of the court below charged the jury thus: " So that if it depends simply upon the question whether the use of the spring cotter in place of a burr and a spring cotter at the time that this engine was put in, was negligence, we should say to you, that it was not, because according to the testimony of witnesses here, about which there can hardly be any room for doubt, this was one method at least which was in very common use. The points of difference to which your attention has been directed are that in the spring cotter which is usually furnished by manufacturers of these engines, the inner side of the wire is flattened, while in this case the wire was left in its original round state. I have carefully examined the testimony, and while it does appear that there is that difference, yet I do not recollect any witness who testifies that the use of a wire of a proper material, even though it were round and were put in, in the same way that this was, would not be as safe as the use of the spring cotter which is manufactured and furnished by the wholesale. If it was as safe as that which is ordinarily furnished with such engines, as the contrivance for the purpose of holding the bolt, we do not think that the defendant company ought to be held guilty of negligence, because they did not use the precise form of a cotter which is usually furnished." The learned judge declined to give to the jury the question whether this kind of cotter was

in common use, or whether it was an insufficient appliance because it was made of round wire bent or of a wire flattened on one side and split at the end, and the only question he did give them was whether the wire cotter that was used had "become so weakened by use that it was no longer safe, and did the defendant know or ought the defendant to have known that fact by the exercise of ordinary care and diligence?"

In this we think there was error, (1) because there was no evidence that it had become so weakened by use that it was no longer safe. It did not wear out, it had not become thin by constant use, it did not break at all at the ends which it was customary to bend back at each time it was inserted in the hole at the end of the fulcrum pin. There was no testimony that it had become crystalized or granulated at the place where it broke or at any other place. In point of fact it broke at the loop of the head where there was no pressure or action and strain upon it. The plaintiff's witness, Miles, the only person who saw it immediately after the accident, testified upon this subject thus: " Q. When you found out, what portion of it was broken if any? A. The wire, of course, formed into a split pin must be doubled; and the one prong or one side of the pin had broken off right at the loop of the head and that part dropped out. Q. Worn out there? A. Not worn out; I couldn't tell that. Q. But it was broken off right at the loop of the head? A. Yes, sir. Q. And then that left it, as it were, divided into two pieces? A. Yes, sir. Q. And by reason of that break then it worked out? A. Yes, sir. Q. Did you find both pieces? A. No, sir, only one piece—the piece with the head on."

No other witness saw the pin after it was broken, and no witness saw or described any defect in it. This witness, testifying for the plaintiff, said it was not worn out, and no witness said it was. There was, therefore, no actual proof of any defect in it. The two witnesses for the plaintiff, Carl and Meekins, said the constant bending and hammering it would tend to crystalize it in a very short time. But the defendant's witness, Pollock, testified that it would not hurt it a particle, and the witness, Vannan, being asked, " Q. Whether there is an opportunity for much wear on that cotter?" answered, " A. There is not; the reason is, there is no tendency for side motion ; the work on the pin is all direct back and forwards, no side motion at all."

But the crowning fact that fully answers the theory of the plaintiff's two witnesses, is the entirely undisputed fact testified to by the plaintiff's witness that he had himself made this pin and put it in the fulcrum bolt at the beginning in 1881, and had used it from that time constantly to the time of the accident, and up to the very time of the accident discovered no defect in it. He was asked: " Q. How long was this piece of wire in there to your knowledge ? A. It has been in there since 1881. Q. About seven years ? A. When the engine was started, yes, sir. Q. It was in use about seven years ? A. Yes, sir. Q. You put it in ? A. Yes, sir. Q. And it was in use up to this time that it fell out and that you put a portion of it away ? A. Yes, sir. Q. And it was being in active use in that engine during all that time ? A. Yes, sir. Q. Do you know why that broke ? A. No, sir, I don't."

An appliance of this kind that continues in constant use for seven years without ever giving out or requiring change, or even repair, cannot be said to be an insufficient appliance. In addition to this the witness testified that he had another wire of the same kind on the same lever, and it was still in use at the time of the trial. He was asked : " Q. Did you have other wires of a similar character, or other cotters in use in that machinery of a similar character ? A. There is one at the other end of the same lever. Q. Had that been in just as long ? A. Yes, sir. Q. It is there yet, is it not ? A. Yes, sir."

This case was tried in May, 1892, and this last wire had therefore been in use about eleven years and was still in use. Against such facts mere theory goes for nothing.

(2) In the second place the pin was duly inspected and no evidence of defect or weakness was discovered. The plaintiff's witness, Miles, the engineer, was asked : " Q. When had you seen it before the accident occurred ? A. I examined the whole connection between half past eight and nine o'clock that morning. Q. State whether or not it appeared to be all right at that time ? A. It was all right at that time. . . . Q. At the time when you examined this wire on the morning before this accident was there any signs of wearing about it—about this wire ? A. I didn't see anything that I know." He also testified that he had oiled the fulcrum pin that morning, so that he had every opportunity of seeing the pin and the wire cotter,

or pin that holds it in place, at a time within a few hours before the accident, and yet he saw nothing wrong about it.

The idea that this wire cotter or pin had become worn until it was weak, or thin, or crystalized, was only an idea unsupported by any testimony. It is true it broke, but what caused it to break is not known, and there is no testimony on that subject.

In Railroad v. Huber, 128 Pa. 63, the defect in the lever of the brake was manifest and was fully proved and had long existed, and if the brakeman had had an opportunity to become acquainted with it, no recovery could have been had. But here there is no such proof and there is proof of a constant inspection which did not disclose any defect.

The mine inspector, G. W. Williams, of the district, employed in obedience to the mining law, testified that he inspected the machinery at this mine about once every three months, and if he found anything out of place or that needed change he made a record of it and suggested it, and, if not, he just mentioned that he made a visit and found the place satisfactory.

(3) In the third place the dropping out of the pin did not cause the accident. Ordinarily, in cases of this kind, the injury or death resulting from defective machinery, is immediately caused by the defective appliance, machine or apparatus, and is therefore a direct result of the negligence alleged against the defendant. But here neither the pin, nor the lever which it held in place, inflicted any injury upon any one. It only gave occasion for the engineer to arrest the further descent of the cage, which he did. What took place after that was only what might have taken place upon any occasion for stopping the cage. That is, the engineer, wishing to raise the cage a few feet to the top of the shaft, made a mistake in drawing his reverse lever a trifle too far, and so produced a greater elevation of the cage than was necessary, or than he intended. And even this mistake of the engineer was not the sole cause of the accident, for, had the deceased miner remained on the cage, nothing that was done or had occurred, or was omitted to be done, would have caused the accident. The accident was the result of a mistaken judgment of the deceased as to the fact of his being in danger. He was in reality in no danger, but he, being one of three all of whom were in the same exigency, thought

he was in danger and jumped and lost his life as a consequence of his jump, while the other two, thinking differently upon the same subject, remained on the cage and were not harmed.

(4) In the fourth place, the testimony develops at best simply a case of ordinary accident resulting from an unforeseen cause, not discoverable in advance of its occurrence, with no visible defect in any part of the machinery, and no knowledge of any defect on the part of the men who were constantly using the machinery, or of the company that employed them. The case comes clearly and distinctly within a number of our own decisions, and the general principle applicable to all is thoroughly expressed in one of the oldest of them : Baker v. Allegheny Valley R. R. Co., 95 Pa. 211. Mr. Chief Justice SHARS-WOOD, speaking for the court, there said : " A servant assumes all the ordinary risks of his employment. He cannot hold the master responsible for an injury which cannot be traced directly to his negligence. If it has resulted from the negligence of a fellow servant in the same employment, he must look to him and not to the master for redress. The master does not warrant him against such negligence. The duty which the master owes to his servants is to provide them with safe tools and machinery where that is necessary. When he does this he does not however engage that they will always continue in the same condition. Any defects which may become apparent in their use, it is the duty of the servant to observe and report to his employer. The servant has the means of discovering any such defects which the master does not possess. It is not negligence in the master if the tool or machine breaks, whether from an internal, original fault, not apparent when the tool or machine was at first provided, or from an external, apparent one, produced by time and not brought to the master's knowledge. These are the ordinary risks of the employment which the servant takes upon himself : Ryan v. The Cumberland Valley R. R. Co., 11 Harris, 384."

The present case is conspicuously within the operation of this ruling. The wire pin is conclusively shown to have been amply sufficient for its purpose, and free from original defect, by the fact that for seven years it continuously and successfully served its use without any change, repair, substitution or visible defect. It gave no external indication of defect up to

the moment of the accident, and there is no testimony that it
had diminished in size, or changed in appearance or in sub-
stance ; no crack or flaw was discovered, and on the actual tes-
timony in the cause no defect was visible or known to the
engineer, the mine inspector, or the defendant.   The breaking
of the wire pin therefore was apparently, or possibly, "pro-
duced by time and use," from a cause "not brought to the mas-
ter's knowledge."   Under the foregoing decision, "these are
the ordinary risks of the employment which the servant takes
upon himself."

As we have very recently reviewed this subject, in a case
which covers every feature of this one, we will simply refer to
that decision for the further illustration of this discussion.
The case is Mensch v. Railroad Co., 150 Pa. 598.   There a
brakeman, whilst engaged in the coupling of a car, was struck
on the head by a bolt projecting from the end of the car, and
very seriously injured, without any fault of his own.   We held
that if the defendant knew, or ought to have known, of the
defect in the bolt within a reasonable time before the accident,
the defendant would have been liable.   But because the de-
fect was not known either to the workmen or to the defendant,
and it was not shown that there was any opportunity for in-
spection at any time after the defect first occurred, we held
that there could be no recovery, and that the accident in such
a state of the facts was one of the risks of the business which
was assumed by the plaintiff.   That case was far more merito-
rious than this, and was much more deserving of judicial recog-
nition.   There the injury was directly inflicted by the defective
bolt.   Here the defective appliance inflicted no injury, and the
workman's death was due to the mistake of the engineer, with
which the pin had nothing to do, and the voluntary act of the
deceased in jumping from the cage.   Even if the broken pin
had been the direct cause of the accident, the case lacks every
element of liability on the part of the employer, which is recog-
nized as essential in all the cases.   If the pin was defective
from long use, and yet this was not manifest even to the engi-
neer who saw it constantly, there is no liability, and that is the
very best aspect in which the case can be put for the plaintiff.
In the case of Mensch the defect was the working off of a nut
from the end of a bolt ; here we do not know whether there was

a defect, and if there was, it was not visible and was not in fact discovered, and of course was never brought to the knowledge of the employer. In these circumstances there is no liability under all the decisions : Railroad v. Hughes, 119 Pa. 312 ; Pittston Coal Co. v. McNulty, 120 Pa. 414 ; Erie & Wyoming V. R. R. Co. v. Smith, 125 Pa. 259 ; Augerstein v. Jones, 139 Pa. 183 ; Allison Mfg. Co. v. McCormick, 118 Pa. 519.

We are of opinion that upon the whole of the testimony in the case the jury should have been instructed to render a verdict in favor of the defendant, and we therefore sustain the fourth specification of error. It is not necessary to notice the other assignments.

Judgment reversed.

Mr. Chief Justice Sterrett dissented.